Oh, last case of the day, 22-17-14, Toya Crain v. Denis McDonough. Okay. Your Honors, may it please the court, counsel, I'm Joseph Allman, and I am a plaintiff, Toya Renee Crain's attorney, and we are very glad to be here. Dr. Crain was a true rock star at the Richard L. Ratherbush VA Medical Center. She came there under a national internship program that was designed to place several up-and-coming stars in the VA system into places where they could become medical center directors. So her whole reason for going from, she was a president of the union at Heinz VA here in Chicago, got in this internship program, she chose Indianapolis over Denver in another facility, I can't And so she came and she dug in. She was in the right place at the right time, was appointed to be the acting chief of Environmental Management Services, EMS. They cleaned the hospital, and in the acting chief position, she was a GS-12. She was told by the HR people that if she got her probationary period done, completed successfully, she would become a GS-13. So I think I would like to talk about the disparate pay first, and then end up talking about the retaliation. Pardon me. While she was being promised this pay increase throughout the Richard L. Ratherbush system, different chiefs of services were being promoted from GS-12 levels to GS-13 and GS-14. As is in my briefing, and I'm sure you've seen, Dr. medical chief. And when I say she was a superstar, she literally saved the agency a million dollars a year. She got rid of the goodwill industries that were working in there, and it just wasn't a good fit for this system. And she got rid of that contract that allowed him to hire about 70 more full-time veterans, which that's one thing EMS does in the VA system. They use veterans. She was a person. She was never satisfied. She held people accountable. Her underlings looked up to her with respect. She developed a camaraderie within the system that did not exist before. The union president, Nicole Golder, testified that it was day and night difference when when Dr. Crane took over. She was just fantastic. There were other VAs using a new chemical that was, you didn't have to mix it, so it was safer to use. It was more efficient. It took less time to clean rooms. She went through a process of getting that chemical change and just improved everything about the EMS at the VA Medical Center. She made a about being creeped out by a subordinate male employee. And there was an investigation, and it seemed to drag on, and nothing was being done. And so she talked to the regional HR, the VISN HR manager, and nothing was happening. But Kathy Lee Sellers, who was the number three executive at the hospital, told her, it went over my head. Let her know. She knew. She had complained, and she initiated internal EEOs, and everything changed. So on the pay, she was supposed to get a GS-13. The agency had the classifier, Elaine Scaife, classify the job. It had been classified on a national basis in 2011. Elaine Scaife, in 2013, classified a job. Of course, it was still a GS-12. Elaine Scaife was by the book. If it wasn't there, it wasn't there. But what did Elaine Scaife do? Well, but here's the situation I'd like to ask you about, Mr. Allman. It appears, okay, it appears that Dr. Crane knew this was a GS-12 position when she took it. I understand that the employer promised to try for reclassification and then did make the attempt. What is the best evidence that the attempt for reclassification was a sham? It appears that the GS-12 classification occurred on a national level. So that really does make it very difficult to assert that the pay scale was the result of race-based discrimination. I was just getting ready to say that, Your Honor, and that's a great question. So what happened, so they have Elaine Scaife write the case. They know it's a 12 already, and her classification comes back, yes, it's a 12. After that, they give Dr. Crane a performance plan, and then a job evaluation, and then the director of the hospital, and in all three of those instances, after Elaine Scaife has done what she did, it's GS-13. And so this sort of melds into the retaliation, because one of the, probably the biggest problem, in my opinion, one of the biggest problems with Judge Young's decision was the lack of understanding of what this probationary period, and the regulations which we've cited, I won't sign them for you unless you want me to, I have it right here, but when you are in an acting position, there's no break in service, acting time counts with your full time. Dr. Crane was in her position over 12 months when she was removed for failure to satisfy her probationary period. That was wrong, and then we have to rely on the reasons given to her for her removal as chief as shows pretext of discrimination. That's the Sanderson plumbing case from the Supreme Court. Every reason they stated on her memorandum, she has contrary evidence to. It's a classic example of what should be heard by a jury in deciding, not decided on somebody's judgment. So all these white chiefs are being promoted. She's promised to be promoted. The paperwork she's given, even after Ms. Scaife gives them the blueprint for what needs to be done to raise her position to a 13, says 13 on it, and then way after the fact, and this is not in my materials, but of course it becomes a GS-13, and the linen and laundry is added to it. That's what Elaine Scaife's roadmap was. That's what they eventually followed. So I've used most all my time here, but I'm just going to say, you know, summary judgment should not be used as such a hammer to decide cases when there are factual, material, genuine issues of material fact that should have precluded. I would respectfully argue both, and I'm going to reserve the last two minutes. Thank you. Thank you. Thank you. Okay, Mr. Kirkland. Thank you, Your Honor. May it please the court. My name is Taylor Kirkland. I'm an assistant United States attorney, and I represent the United States of America Department of Veterans Affairs through its secretary in this appeal. This is a fact-found appeal that comes down to the evidence in the record. That evidence is voluminous. Ms. Crane had plenty of opportunities to develop that factual record, and the evidence does not show that Ms. Crane was paid less on account of her race, and it does not show that her removal as chief of EMS was retaliatory. Mr. Kirkland, on that second one, the retaliatory, there are a variety of kind of bins of evidence. There's the improperly advised a candidate evidence, then there's evidence with regard to the profanity, the cleaning solutions, the failure to complete the probationary period, then the handling of the uniforms. If Ms. Crane were to prevail on any one of those, would that have resulted in a remand, or must she run the table and prevail on all of those? So under the federal sector retaliation standard applicable under this circuit's case law, the federal sector employee has the right to be freed from any discrimination. So we would say that if there was a taint or some sort of hint of retaliatory animus here, that might change the outcome, but there's not a hint of any retaliatory animus here. So just to deal with that, since Judge Brennan brought the point up, I'll start with retaliation. Ms. Crane was removed as chief of EMS for performance problems that were reported by a variety of different employees throughout an enormous hospital in Indianapolis. First of all, as Your Honor mentioned, she mistreated her subordinates. She was given a warning about this in November of 2014. That's before she engaged in any protected activity. It was directed specifically to her. She signed it to her employer for her, and that memorandum said that it was unacceptable for supervisors in EMS to use abusive or profane language to their subordinates, and despite that, a few months later, another employee in a different service complained that on a conference call, Crane had used profanity, and then subordinates in EMS came forward a few months after that and told the VA that so much so that one of those employees said that he was thinking about quitting because of the way that she was talking to him. So this was powerful evidence the VA had that Crane was not complying with the warning that it had given specifically to her. Going to the other issues in that removal memorandum, the interference with the interview process for the assistant chief position, there's, again, there's no disputed evidence here in the record. The interview panel was a panel that Dr. Crane had worked on writing the questions for, so she knew what questions were going to be asked. The panel members reported that the person who had been identified as the hand-picked candidate that Crane wanted to hire seemed to have this premonition about what was going to be asked of him, and then at the EEOC hearings, that candidate, Robert Franklin, admitted that before the interview, Crane had pulled him into her office, sat him down, and told him what to study in order to ace the interview. I know there's no dispute that this was an improper action, and the last two issues are similarly undisputed. Crane, by all accounts, according to the 600 pages of testimony before the EEOC, botched the rollout process for the interview for the uniforms and in nursing, requiring another service to come in and do the job itself, and whether or not she disputes the decision to change cleaning solutions, the fact of the matter is that the coordinator for cleaning to VA management about her decision to change cleaning supplies, and the VA management thought that was indicative of her inability to communicate effectively with other departments, so there's no hint at all of any sort of improper motive here in in her removal as chief of VMS. She asserts that her actions saved the facility a million dollars a year, and that the facility passed an inspection with the Joint Commission that resulted in a finding of no deficiencies for the first time ever. I mean, is she correct that she accomplished these things? She's certainly correct that during her time in the chief of VMS position, she did things right. I mean, we're not saying that she did every single thing every day wrong, but as laid out in this removal memorandum, there were a plethora of performance issues that were reported by a variety of different employees in the hospital, and it doesn't allow for a reasonable inference that the VA was retaliating against her when all these different employees were reporting that her performance problems were, frankly, just voluminous. But did she, you know, it's sort of yes or no. I mean, did she save a million dollars? Were there no deficiencies reported for the first time ever? Is that true? I'm sorry, I didn't mean to cut you off. No, no, I'm sorry. All I was saying is, are those things true? Well, I don't have any contrary evidence to show that they're not true, but those were issues that were noted in this removal memorandum. They weren't grounds that the VA used to justify her removal. So again, whether or not Dr. Crane did some things correct is completely beside the point. What she did was engage in extensive misconduct and mismanagement over the course of her probationary period, and that's the point, as this court has said, the point of a probationary period is to give employees a trial run, and she flunked it, and so the VA removed her, and that's not retaliation. Is the facility still using the cleaning products that she changed to? I don't know the answer to that, Your Honor. I'm sorry. Okay. And just briefly, as my time is running short, I'll address the disparate pay point. The evidence doesn't show that Dr. Crane was paid less on account of her race. The fundamental analytical hook for this inquiry is whether she was paid unequally for equal work, and the evidence shows she was not. As the court has already brought up, Dr. Crane applied for and accepted the position knowing that it was a GS-12. It was a GS-12 because the VA central office told the Ratterbush Hospital it had to be a GS-12. After Dr. Crane accepted this position knowing it was a GS-12, the assistant medical director of the hospital actively worked to try to get it raised to a GS-13, including taking steps like reorganizing EMS in order to add positions to it to justify a higher level, and the classifier, Elaine Scaife, conducted what in her words were an extensive review in which the position was basically taken apart and seen what could be done in order to justify a higher grade. None of that smacks of race discrimination at all on the part of the VA, and the most likely candidate, the best theory that Crane had was to accuse Scaife, the classifier of engaging in racial discrimination against her, but she specifically disavowed any suggestion that Scaife was discriminating against her. Additionally, Crane could have appealed this classification decision, and she decided not to. None of this has any hint of retaliation or of discriminatory animus. The comparators that Crane's identified are not comparable to her, as this court has said time and again. The comparator inquiry looks at whether there's a meaningful comparison that is possible between the comparators, and the particular comparators that Crane has identified are not meaningfully comparable to her because, based on the undisputed evidence, they did different work. They did different things. Their job duties and responsibilities were totally different. There's no dispute about this because not only did Scaife testify to that, and it hasn't been contested in any way, but Crane was confronted with this evidence for the EEOC, and she admitted that the Chief of Logistics Service did different jobs than her. So these two positions are completely different. If the panel has any questions, I'm happy to take them. Otherwise, I'll ask the court to reform it. Thank you. I won't keep this much longer either. Thank you, counsel. The mistake that Toya Crane made was to file EEO charges against her employer. That changed everything. That's what she did wrong. And you can read it, and you have read it. Thank you very much. In our brief, there's a ton of evidence to counter all of what Mr. Kirkland just said about the interview process. She does not admit, and no one confessed that there was questions given to Robert Franklin before he was interviewed. She was strangely taken out of that position, and then the gentleman who took her out says, well, he interviews everybody and picks them himself. So what is going on here? Something is going on. Discrimination is what's going on. She included the comparators. The case out of the—let me grab my case. I'm sorry. The Johnson Zima Systems Corporation case is a good one, I think, talking about comparators. And there was a situation where the court rejected the contention very similar to what Mr. Kirkland said. And they said both of these people are intermediate managers. They have different titles. Also, they do some different work. Well, these other chiefs are identical comparators to Dr. Crane. They all lead their service. They all report to the same executive management. She doesn't have a comparator. If you allowed her to not have a comparator of these other chiefs because EMS cleans the things, logistics moves stuff around, that would be like this case, Johnson versus Zima. It would be the same thing. And that's ridiculous. She didn't botch uniform rollout, the infectious disease thing. She brought everybody in house to talk about. So we respectfully wish that those items go back to the district court. Thank you. Well, we thank you, Mr. Allman, and we thank you, Mr. Kirkland, very much. And the case will be taken under advisement.